**Eula Bush BUNDREN, et al., Plaintiffs,**

v.

**Dennis L. PETERS, et al., Defendants.**

Civ–3–88–1011.

United States District Court,
E.D. Tennessee, N.D.

Dec. 12, 1989.

---

Charles Hampton White, Richard L. Colbert and Rebecca Wells–DeMaree, Cornelius & Collins, Nashville, Tenn., for plaintiffs.

John P. Long, Adams, Taylor, Philbin, Pique & Marchetti, Nashville, Tenn., for defendants.

## MEMORANDUM OPINION

JORDAN, District Judge.

This is a civil rights action under 42 U.S.C. § 1983 in which the plaintiffs, Eula Bush Bundren, Betty Sue Pearman, Cyn-

thia Surber, Elizabeth Ann Fugate, and Wayne Parkey Fugate, allege that the defendants Dennis L. Peters and the Claiborne County Board of Education violated their rights under the First and Fourteenth Amendments to the United States Constitution; the plaintiffs also bring pendent claims under the Tennessee Teachers Tenure Act, T.C.A. §§ 49–5–501, *et seq.*, and the Tennessee Open Meetings Act, T.C.A. §§ 8–44–101, *et seq.* [Docs. 1 and 7.] This case was tried to conclusion from August 29, 1989 through September 1, 1989. Pursuant to Rule 52(a), Fed.R.Civ.P., this Memorandum Opinion serves as the Court's Findings of Fact and Conclusions of Law.

## I. FACTS

### A. *General Circumstances*

The plaintiffs are all employees of the Claiborne County School System. They worked in various administrative and academic positions in a predominantly rural school system with eleven (11) elementary, middle and high schools with a combined enrollment of approximately 5,000 students and more than 300 teachers and administrative personnel. Eula B. Bundren (Ms. Bundren), Betty S. Pearman (Ms. Pearman), Elizabeth A. Fugate (Ms. E. Fugate), and Wayne P. Fugate (Mr. W. Fugate) were all tenured teachers prior to August, 1988; the plaintiff Cynthia Surber (Ms. Surber) did not acquire tenure until August, 1988.

In September, 1984, the defendant Dennis L. Peters (Mr. Peters) was elected to the office of Superintendent of Schools for Claiborne County; Mr. Peters was reelected to this position in August, 1988. When he assumed his duties in 1984, Ms. Bundren, Ms. Pearman, Ms. E. Fugate, and Mr. W. Fugate were all assigned to administrative positions in the central office. Several witnesses testified that shortly after assuming the duties of Superintendent in 1984, Mr. Peters held a meeting at which he stated that he was aware that some employees had opposed his election but that he was elected for four years and the employees only yearly.

The duties and responsibilities of the Superintendent of Schools include assignment of personnel to various schools or to the central office and the preparation of the budget for submission to the County Board of Education (the Board). The Superintendent also maintains statistical and other records and reports to the State Department of Education.[1] Salaries for some administrative personnel are paid in whole or part with State and federal funds or through grants. Every year since the 1983–1984 school year, the Claiborne County School System has had a deficit. During the summer of 1988, the School Board was forced to consider making cuts in the budget due to persistent deficits experienced in the school system. Final budgetary authority, however, lay with the Claiborne County Board of Commissioners (County Commissioners). Against the backdrop of these budgetary problems, Mr. Peters faced reelection in August, 1988. He was opposed by Don Edwards, a former Board member, and one of the plaintiffs, Ms. Bundren.

On at least one occasion, an official of the Department of Education of the State of Tennessee wrote a letter to Mr. Peters on April 2, 1987 [defendants' ex. 1], to recommend that the possibility of reducing the number of administrative personnel should be considered because the County School System supported a larger staff than comparable systems in the State. Nevertheless, a year later, at the meeting of the Claiborne County Board of Education on April 7, 1988, the Board voted to continue to hire the same administrative staff for the 1988–1989 academic year. [Plaintiffs' ex. 27.] Ms. Bundren testified that from 1984 through August, 1988, her position continued as it had prior to Mr. Peters' election, although additional duties were assigned to her by Mr. Peters. From September 1, 1984, until August 1, 1988, the total central office administrative and support staff had increased from 27 to 31 and in November, 1988, this number had reached 34. [Plaintiffs' ex. 3.] Some of

---

**1.** For a discussion of the interrelationship of the local governing bodies and the State Department of Education, see *State ex rel. Weaver v. Ayers*, 756 S.W.2d 217, 221–225 (Tenn.1988).

these positions were, however, apparently part-time.

Although Mr. Peters testified that he had considered reassigning some administrative personnel to teaching positions and had made one or two part-time classroom assignments, at the regularly-scheduled meeting of the Board on April 7, 1988, the month during which hiring decisions were made every year, he recommended that the plaintiffs be rehired for the same positions they had been occupying previously. Moreover, despite continuing budgetary problems, no discussion of the financial condition of the school system is reflected in the minutes of this meeting. [Plaintiffs' ex. 27.] At the next regularly-scheduled Board meeting on May 10, 1988, the Board hired central office support staff. Again, no discussion of the school system's financial problems is reflected in the minutes. At the meeting of June 3, 1988, the minutes include one short item regarding the 1988–1989 budget [plaintiffs' ex. 27, June 3, 1988, minutes at p. 3, item 4.B]. A budget of $13,084,102.00 was unanimously approved for submission to the County Commission. The minutes of the July 14, 1988, meeting of the Board merely state that the budget was on the agenda of the County Commission meeting set for July 18, 1988.

None of the minutes of the regularly-scheduled meetings held from April 7 through July 14 demonstrate much concern for the budgetary problems or for reassignment of school personnel to relieve long-standing budgetary constraints. Moreover, although Mr. Peters was aware that the funds available for the programs to which several of the plaintiffs were assigned were discretionary as early as 1984, he did nothing about making reassignments until after his reelection in 1988.

Following Mr. Peters' reelection on August 4, 1988, the minutes of the August 22, 1988, Board meeting include a discussion of alternatives for reducing the school budget. Three alternatives were proposed by the Superintendent: (1) to abolish eight teaching positions at six schools; (2) to abolish ten teaching positions at four

schools; or (3) to provide bus transportation for only as long as State transportation funds were available, which would prevent abolition of any teaching positions. The third alternative was unanimously adopted by the Board. In addition, the Superintendent recommended that the positions occupied by four of the plaintiffs, Ms. Pearman, Ms. Bundren, Ms. E. Fugate, and Mr. W. Fugate, be abolished for lack of funds [2] and that these plaintiffs be reassigned to teaching positions because the School System was "losing eight classroom teaching positions" [plaintiffs' ex. 27, August 22, 1988, minutes, item 5.B, at p. 2]. The Board voted to abolish the plaintiffs' positions by a split vote (three voting yes, two voting no, and two abstaining).

Although the administrative school year had commenced on August 1, 1988, with employees reporting to the positions to which they had been hired in the previous April, Mr. Peters also recommended a number of other personnel reassignments [id., at pp. 2–4] that included placing Ms. Bundren and Ms. Surber at Clairfield School, Ms. Pearman at Ellen Myers School, Ms. E. Fugate at H. Y. Livesay School, and Mr. W. Fugate at Powell Valley High School. Other employees were reassigned at the same time as well.

A member of the Board, Dr. Roy Ellis, testified that he could not recall any reports by Mr. Peters at Board meetings concerning the 1988–1989 school budget problems. Moreover, he had not been informed prior to August 22, 1988, of Mr. Peters' proposals regarding the abolition of these four administrative positions occupied by Ms. Bundren, Ms. Pearman, Ms. E. Fugate, and Mr. W. Fugate or the three alternative proposals concerning abolition of teaching positions or the suspension of bus services. He was unaware of the eight positions to which Mr. Peters was referring when he recommended that the four plaintiffs' administrative positions be abolished. Another Board member, Sam Widner, also testified that the first he had heard of the proposed position changes was on August

---

**2.** The positions of Ms. Pearman and Ms. Bundren were federally subsidized and that of Ms.

E. Fugate was subsidized by both the State and federal governments.

22, 1988, but he accepted Mr. Peters' recommendations. Board member Bobby Williams stated that he passed on the vote to abolish the four administrative positions because the notice was too short to make a reasonable judgment. Charles R. (Randy) Burchett, another Board member, also conceded on cross-examination that Mr. Peters had not raised the possibility of abolishing the plaintiffs' administrative positions prior to August 22, 1988, although Mr. Burchett had for some time expressed concern that the central office was overstaffed.

Further, the abolition of these four positions was not specifically noted on the printed agenda for the August 22, 1988, meeting; however, in his deposition, Mr. Burchett stated that at a pre-meeting gathering of Board members and several employees at Mr. Peters' house on August 22, Mr. Peters told him that he had a list of positions to be abolished. At this pre-meeting gathering, Mr. Burchett saw a legal pad on which Mr. Peters had written at least four positions that he proposed to abolish. [Plaintiffs' exhibit 22, doc. 28, depo. of Randy Burchett, at pp. 76–77.] He also testified in his deposition that Ms. Surber's transfer was first brought up the night of August 22, 1988. [*Id.*, at pp. 78–79.] In his deposition, Mr. Burchett testified that he relied on Mr. Peters' recommendation [*id.*, at p. 60] but denied this at trial. Glenn Yoakum, also a Board member, testified that although he had previously recommended to Mr. Peters reductions in administrative personnel as early as 1985, no such action was recommended by Mr. Peters until August 22, 1988. He stated that Mr. Peters did not discuss the abolition of these four administrative positions until after the August, 1988 election.

At the next regularly-scheduled meeting on September 8, 1988, Mr. Peters presented the revised 1988–1989 budget for the Board's approval; however, the County Commission had not yet approved the original budget. This budget was unanimously adopted as presented and submitted to the County Commission. Despite having reduced the central office staff the previous month, Mr. Peters also recommended that Steve Minton be transferred temporarily to the central office, which the Board approved unanimously as well. At the November 10, 1988, Board meeting another employee was placed in the central office, although her position was funded by a grant. On January 12, 1989, Mr. Peters recommended to the Board that an employee be transferred to the central office, which the Board approved unanimously [plaintiffs' ex. 27, January 12, 1989, minutes, item 5.B, at p. 2]. At the Board meeting of April 6, 1989, the Superintendent recommended personnel to be employed for the 1989–1990 school year, which included retaining at least two of the three positions in the central office that had been added after the abolition of four of the plaintiffs' positions on August 22, 1988. [Plaintiffs' ex. 27, April 6, 1989, meeting, item 5.A, at pp. 2–3.] Further, although Mr. W. Fugate, Ms. Pearman, and Ms. E. Fugate were rehired, they were not placed in any position as of the April 9, 1989, meeting. Ms. Surber was again assigned to Clairfield school.

## B. *Particular Plaintiff's Circumstances*

### 1. *Eula Bush Bundren*

Ms. Bundren testified that she had been the director of the chapter II achievement evaluation program since 1981. Throughout this time, she had been assigned to the central office, from which she lived only a short distance. Following Mr. Peters' election in 1984, he added the title II federal program to her responsibilities but made no other changes in her duties until August 22, 1988. Federal funds paid her salary. Following the April 7, 1988, Board meeting, she received a notice dated April 8, 1988, that she had been reelected as the director of the chapter II program for the 1988–1989 term, which she accepted on the same day. [Plaintiffs' ex. 4.]

On April 18, 1988, Ms. Bundren announced that she would be a candidate for election to Superintendent of Schools. She ran her campaign during the summer and placed advertisements in the local paper and on local radio stations. In the course of the summer, she had intermittent contact with Mr. Peters concerning school business but not concerning the election

itself. Following the election on August 4, 1988, her next contact with Mr. Peters was on August 15, 1988, when he told her not to complete work on her assigned projects for the up-coming school year. She testified that Mr. Peters told her that he could not leave her in her position after the negative election campaign that she ran against him. At trial, the plaintiff's counsel read from the transcript of a tape that Ms. Bundren had surreptitiously made of this April 15 conversation. Although portions of the tape were unintelligible, Mr. Peters confirmed that certain of the statements were made. Referring to Ms. Bundren's political campaign against him, Mr. Peters expressed outrage that she should expect to remain on his staff and told Ms. Bundren that he intended to abolish her job. Observing that the funds for her program were discretionary, Mr. Peters stated that he had left her alone for the first four years but that he could not ignore the negative comments that she had made about him in her campaign against him.[3]

On August 22, 1988, Ms. Bundren's position was abolished and she was reassigned as a classroom teacher at Clairfield school. Clairfield is approximately 35 miles from Ms. Bundren's home; to reach it, she must take a circuitous route over mountainous roads through Claiborne County into portions of Virginia and Kentucky and back into Tennessee, which requires over an hour of travel time in good weather and longer in bad weather. This transfer effectively increased her working day from 7½ to about 10 hours. She received no notice that her position was to be abolished or that she was to be transferred to Clairfield. As a result of this change, her monthly salary fell from net earnings of $1,743.66 as of August 12, 1988, to $1,453.09 on September 15, 1988.

By a letter dated August 24, 1988, she was informed that her position had been abolished and that she had been transferred to Clairfield. [Plaintiffs' ex. 5.] Although this letter states that eight teaching positions had been cut, necessitating her transfer to a classroom, the minutes of the August 22, 1988, Board meeting do not clearly reflect such an action by the Board; rather, the Board voted to suspend bus service rather than to abolish any teaching positions. Mr. Peters testified that these eight positions to which he referred in this letter were not the same as those included in the three alternatives recommended to the Board at the August 22 meeting and resulted from a net decline in student enrollment; however, Mr. Peters was unable to specify what eight positions were involved. Mr. Peters stated that by transferring Ms. Bundren funds were made available for other uses, such as the purchase of equipment and supplies for classrooms and libraries.

### 2. *Betty Sue Pearman*

Prior to August, 1988, Ms. Pearman occupied the position of supervisor of the chapter I program, which is a federally funded program for underachieving children. In April, 1988, the Board reelected Ms. Pearman to this position, just as it had with the other plaintiffs. Although she did not actively campaign for anyone in the 1988 Superintendent's election, she was friends with Ms. Bundren. Without prior notice, on August 22, 1988, her position was abolished and she was transferred to a teaching assignment at Ellen Myers Elementary School as a chapter I teacher. She has since been reassigned to Clairfield elementary school to teach special education. She believed that Mr. Peters retaliated against her because of her friendship

---

**3.** Ms. Bundren raised as an election issue the *State audit's recommendation that Mr. Peters refund the County $4,000.00 that he had received as redundant expenses reimbursements. At a meeting of the County Commission on July 18, 1988, a resolution was introduced regarding "double dipping" by the Superintendent's office and recommended an audit. [Plaintiffs' ex. 12.] The minutes of the August 22, 1988, Board meeting [plaintiff's ex. 27, August 22, 1988, minutes,* item 6, at pp. 4–5] reflect the action taken by the Board to reconcile Mr. Peters' expense accounts. Mr. Peters claimed that he had unclaimed expenses over $4,300.00 and thus that he had not received redundant reimbursements. The Board agreed to reimburse these expenses and Mr. Peters agreed to pay the amount attributed to double dipping in the audit. [Plaintiffs' ex. 28].

with Ms. Bundren. They were closely associated both socially and professionally. As a result of her reassignment, her salary decreased from $27,182.64 to $24,941.36.

Mr. Peters testified that Ms. Pearman was reassigned as part of a general effort to place more teachers in the classrooms and to reduce the number of administrative personnel. A number of personnel reassignments were made during this period. He had already given Ms. Pearman a part-time teaching assignment for the 1987–1988 academic year. Immediately following the August 22, 1988, Board meeting, Ms. Pearman expressed her surprise about the transfer but she had no further contact with Mr. Peters concerning her reassignment.

### 3. *Cynthia Surber*

Ms. Surber was a nontenured teacher in the Claiborne County School System prior to August, 1988. During the 1987–1988 school year, she taught at Ellen Myers school. Prior to the election of August, 1988, due to rumors about possible teacher layoffs, Ms. Surber testified that she spoke with Mr. Peters concerning her position at Ellen Myers and was assured by him that her position there was secure; however, on August 22, 1988, Mr. Peters recommended that she be reassigned to teach at Clairfield, which required a long drive over poor roads.

Ms. Surber stated that on election day, August 4, 1988, she rode to her polling station in a truck owned by Jesse Mullins, who was active in Don Edwards' campaign against Mr. Peters; Mr. Mullins' truck had a Don Edwards' campaign sticker displayed on it. In addition, while at the polls, Mr. Peters' wife, Sandy Peters, saw her with her sister and her niece, who was wearing an Edwards' t-shirt. Mr. Peters had previously commented to her that he considered Mr. Edwards his most serious challenger for Superintendent. Jesse Mullins testified that his wife is Ms. Surber's sister and that he was very active in Mr. Edwards' campaign. He had placed signs and posters in his yard as well as put a bumper sticker on his truck supporting Mr. Edwards. He could recall that Ms. Surber had ridden in his truck with his wife occasionally but could not recall specific instances.

On August 22, 1988, Ms. Surber attended the Board meeting. When she was transferred to Clairfield on Mr. Peters' recommendation, she became upset and personally addressed the Board about the reasons for her transfer. She was told the change was made to save money. She did, however, obtain tenure that night. Although members of the Board denied having made any remarks about the politics of the changes, Ms. Surber testified that several members of the Board privately indicated that these personnel changes were political in nature.

The principal of Ellen Myers school, Troy R. Poore, testified that he recommended that Ms. Surber continue to teach at Ellen Myers but shortly before the Board meeting on August 22, 1988, Mr. Peters told him that Ms. Surber would not be returning to Ellen Myers. By that date, teachers had reported for in-service workshops at their assigned schools and Mr. Poore had begun to make teaching assignments. He was not aware that reassignments were to be made; however, last minute personnel changes occur regularly at the beginning of every school year.

### 4. *Elizabeth Ann Fugate*

Prior to August, 1988, Ms. Fugate occupied an administrative position in the central office in the title I program, a State and federally funded program to identify students needing special education services. In addition, she was an elected member of the Claiborne County Commission, which has budgetary authority over the Board of Education. Although she voted on issues such as the property tax rate, which related indirectly to the Board's budget, as an employee of the School System, she routinely abstained from voting on issues otherwise related to the Board of Education.

On July 18, 1988, the Claiborne County Commission met in regular session and the minutes reflect that the Commission considered issues related to the Board of Education. [Plaintiffs' ex. 12.] One was a

resolution concerning an audit of the Board due to allegations that the Superintendent had received redundant reimbursements of expenses. Ms. Fugate and another Commissioner abstained from voting on this resolution because they were employees of the Board. The resolution failed in a seven-to-nine vote, with two abstaining and three absent. [*Id.*, item VIII–A3, at p. 4.] Another item regarded the school budget, from which vote Ms. Fugate also abstained; however, Ms. Fugate did vote to set the property tax rate and made a motion to set that portion of the property tax that would fund the Board's budget. [*Id.*, item VIII–B, at p. 5.] Ms. Fugate testified that the audit resolution resulted from media coverage of the Superintendent's election campaign in which Ms. Bundren had raised this issue.

Between July 18 and August 22, 1988, Ms. Fugate had no discussions with Mr. Peters concerning her votes on the County Commission. She attended the meeting of the Board on August 22, 1988, and learned for the first time that her position was to be abolished and that she was to be placed in a teaching position. Although the County Commission had not yet adopted a budget for the school system, Mr. Peters attributed these personnel changes to budget cuts that would result in the loss of eight teaching positions but he did not specify what eight positions were to be lost. She received a letter dated August 24, 1988, from Mr. Peters concerning her reassignment to a teaching position at H.Y. Livesay School for the 1988–1989 school year. As a result of her reassignment, her monthly net salary fell from $1,835.13 in August, 1988, to $1,569.76 in September, 1988.

On August 23, 1988, when she was collecting her belongings from her desk in the central office, she encountered Mr. Peters and asked him why she was transferred. She testified that Mr. Peters told her that budget constraints required it and then he commented on her voting record on the Commission, which in his eyes cast doubt on her loyalty to him. She could recall other occasions on which Mr. Peters made comments on her Commission voting record regarding school issues but could not remember specific dates.

Although Ms. Fugate stated that transfers and personnel changes occur yearly and that the school budget is a persistent problem for Claiborne County, no positions had been abolished prior to August, 1988. At that time, approximately twenty positions were changed or abolished for the 1988–1989 school year.

Mrs. Ruth Fugate also testified at trial; she was an employee of the school system and is the mother of Ms. E. Fugate and Mr. W. Fugate. She testified that she was told by Mr. Yoakum that Mr. Peters did not approve of Ms. E. Fugate's Commission votes, although Mr. Yoakum denied that he ever made such a comment. She overheard the discussion between Mr. Peters and Ms. E. Fugate on August 23, 1988. At some point she joined the discussion, which lasted for about an hour, but did little talking, except to comment that Mr. Peters had come down hard on special education when he made these personnel changes. She recalled that Mr. Peters remarked that he was not happy with Ms. E. Fugate's voting record on the Commission and that he felt she was not supporting him.

Mr. Peters denied that he had retaliated against Ms. E. Fugate for her voting record on the Commission, but he confirmed that he had a discussion with Ms. E. Fugate and Mrs. R. Fugate on August 23, 1988, about Ms. E. Fugate's transfer to a teaching position. He did recall saying that he was disappointed about the Commission resolution concerning the audit of his expenses.

### 5. *Wayne Parkey Fugate*

Mr. Wayne Fugate was the supervisor of special education attendance from the spring of 1985 until August 22, 1988. In all, he had approximately 19 years experience as a school administrator, prior to which he had been a classroom teacher for about seven years. In addition, in September, 1987, he assumed the duties of administering vocational assessments of students. His administrative position was partially funded by federal aid. On August 22, 1988, without prior notice, his position was abolished and he was transferred to

teach at Powell Valley High School. [Plaintiffs' ex. 15.] As a result of his reassignment his net monthly earnings decreased from $1,743.66 in August, 1988, to $1,453.09 in September, 1988. Although he was not certified to teach special education, he was assigned to teach special education for the tenth and eleventh grades and was required to obtain a waiver from the State [plaintiffs' ex. 17]. He was also required to obtain additional education at a local university, which he paid from his own funds.

Mr. Peters denied abolishing Mr. W. Fugate's position and transferring him out of any retaliatory motive. He testified that, as with the other administrative positions, he made these changes to accommodate budget constraints and to place more teachers in the classroom by reducing the number of administrative personnel in the central office. He assumed that Mr. W. Fugate was certified in special education because his responsibilities encompassed special education programs.

## C. The Pre–Meeting Gathering on August 22, 1988

On August 22, 1988, Mr. Peters arranged to have an informal dinner party at his home for members of the Board and invited certain other employees of the school system to attend as well. In addition to the seven members of the Board and Mr. Peters, several supervisors, principals, and central office staff members were invited to Mr. Peters' house for sandwiches prior to the Board meeting that evening. A total of about 14–to–16 people were present in the course of the evening. In part, the gathering served as a reception for a newly elected member of the Board, Clarence Breeding, who took Don Edwards' place on the Board. No notice of this gathering was published. The dinner party lasted for approximately an hour, breaking up in time for the Board meeting. Personnel recommendations were discussed with some individual members of the Board but not as a group and not with every member. Mr. Peters' proposal to abolish certain administrative positions was discussed with Mr. Yoakum and Mr. Burchett. The three alternative proposals concerning abolition of certain teaching positions as opposed to the suspension of bus service were also discussed with some Board members.

Board member Dr. Ellis testified that similar gatherings had been arranged in the past before other Board meetings. He did not recall that Mr. Peters discussed anything specifically with him at the August 22 gathering and had no recollection of discussing proposals to abolish any positions. The Board was, however, aware of the problem with the size of the administrative staff and of the State's recommendations to reduce it but no discussion occurred during the gathering about how any member should vote. Dr. Ellis did say that similar gatherings had been held previously "as a matter of course just to see one another ... and then get together so that we can speak freely, openly, but without any violation, insofar as I'm concerned, of any Sunshine Law." He stated that the votes he cast that night were independent and not predetermined before the regular meeting of the Board that evening. Nevertheless, on cross-examination, Dr. Ellis testified that he did overhear Mr. Yoakum remark about four positions that were to be abolished. Prior to August 22, 1988, however, he had not been informed of any proposals to abolish any positions.

Sam Widner, another Board member, testified that about 14–to–16 people gathered at Mr. Peters' house for sandwiches before the August 22 Board meeting. He stated that he did not discuss any specific matters with Mr. Peters about Board business. Nor did he recall overhearing Mr. Peters discuss abolishing any positions with Mr. Yoakum. He had no prior knowledge that any positions were to be abolished until the proposals were made at the Board meeting itself.

Newly-elected Board member Clarence Breeding arrived at Mr. Peters' house for what he thought was a reception in his honor. Mr. Peters introduced him to the people at the party and they engaged in casual social conversation; he had no recollection of any specific topics of discussion. While at the courthouse just before the Board meeting, however, he did recall Mr.

Yoakum remarking that he would support Mr. Peters if Ms. E. Fugate's name was removed from the list. He did not understand Mr. Yoakum's reference. He emphasized that he did not talk to any Board member at Mr. Peters' house about anything on the agenda of the Board for that night. He voted against abolishing any positions because he did not think he had enough information.

J.P. Barnard testified that he and the other members of the Board gathered at Mr. Peters' house on the evening of August 22 for an informal dinner; several employees of the school system were also present. Budget problems were generally discussed in a casual manner and Mr. Peters did comment that eight teaching positions might be eliminated, but no discussion of voting took place among any of the Board members or with Mr. Peters. He was unaware of any proposed elimination of positions before this date and the abolition of four administrative positions were not on the agenda.

Randy Burchett attended Mr. Peters' party on August 22, 1988. He testified that as a Board member he had long been concerned about the size of the central office staff and had specifically made inquiries about what Mr. W. Fugate's duties involved. He recalled that he made such inquiries yearly in 1986, 1987, and 1988. At Mr. Peters' home, he spoke with everyone present during the course of the evening but, although he had no specific recollection of what was said, he testified that nothing on the agenda was discussed. Mr. Peters did, however, mention abolishing several positions. Earlier in the day, Mr. Burchett had spoken with Mr. Peters on the phone about abolishing positions but Mr. Burchett did not say anything to any of the other Board members about Mr. Peters' proposals. The abolition of these four administrative positions was not on the Board's agenda. As previously noted,

Mr. Burchett was much more specific in his deposition about the details of the gathering at Mr. Peters' home on August 22, 1988.[4]

Glenn Yoakum, a long-time member of the Board, testified that he had been concerned for some years about the size of the central office staff and had raised the issue on several occasions. Nevertheless, Mr. Peters never recommended abolishing any central office positions until the evening of August 22, 1988.

Board member Bobby Williams was present at this gathering. He testified that the conversations centered on the budget problems but he could not recall whether anything on the agenda was discussed. He did recall discussing personnel changes at Tazwell–New Tazwell School and the abolition of four central office positions. Overstaffing at the central office had been a persistent concern; however, abolishing these positions had not been discussed before this evening.

Mr. Williams' brother, Trent Williams, is employed in the central office and was present at this gathering. Trent Williams testified that he had no specific recollection of what was discussed at this gathering concerning the abolition of these four administrative positions; however, he stated that August 22 was the first time Mr. Peters took any significant action to reduce the size of the central office staff.

Troy R. Poore, a school principal, also attended Mr. Peters' dinner gathering. He stated that no Board business was discussed but was unable to recall much about the gathering other than some discussion of the budget. Wayne S. (Steve) Minton, an employee of the school system in the central office, was present at Mr. Peters' home on August 22. Mr. Minton was transferred to the central office on September 8, 1988.[5] Mr. Minton testified that no

---

4. The Court is convinced that Mr. Burchett's deposition testimony is far more accurate and reliable than his trial testimony concerning the August 22 gathering.

5. Defendants' exhibit 5 reflects the number of professional staff members in the central office in 1987–1988 and in 1988–1989. By contrast,

plaintiffs' exhibit 3 lists all professional and nonprofessional central office employees. While four professional positions were abolished on August 22, 1988, several such positions, full and part time, were subsequently added and no significant sustained reduction in staff actually occurred in the central office as a result of these changes by Mr. Peters.

Board business was discussed at the gathering, but he did state that the abolition of the central office positions was not raised previously and that he had no knowledge of it prior to the August 22 gathering. Mr. Peters denied that any collective discussion of Board business took place at his home, but he did speak with several members of the Board individually about school issues.

## II. CONCLUSIONS OF LAW

A. *Federal Claims under the First and Fourteenth Amendments*

The plaintiffs have alleged that the defendants violated their rights to free speech and to substantive due process under the First and Fourteenth Amendments. The defendants were undoubtedly acting under color of law at the time of these alleged violations as all actions regarding these plaintiffs were taken in the defendants' official capacities.

In *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court held in a comparable case that the burden is upon the plaintiff "to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'—or to put it in other words, that it was a 'motivating factor' in the [defendants'] decision," *id.*, 97 S.Ct. at 576, after which the defendants have the opportunity to demonstrate "that [they] would have reached the same decision ... even in the absence of the protected conduct." *Id.* The Court notes here, however, that the issue of whether the defendants' actions were otherwise legitimate under State law is considered separately from that of whether any of the plaintiffs' constitutional rights were violated.

Public employment does not require a person to relinquish constitutional rights to free speech, although the government's interest as an employer in regulating conduct directly related to the efficiency of public services is recognized. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1686, 75 L.Ed.2d 708 (1983). *See also Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) ("Vigilance is necessary to insure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech"). A public employee has the right to participate in public affairs. *Connick, supra,* 103 S.Ct. at 1689. Such a right is obviously fundamental in our system of government. Teachers enjoy these rights no less than other public employees. *See Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

In *Pickering,* the Supreme Court stated that "[t]he problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.,* 88 S.Ct. at 1734–1735. The circumstances in which the employees expressed themselves and the subjects to which they addressed themselves must be considered, including the existence of any overriding governmental interest. *Id.,* at 1735–1738. Moreover, the First Amendment protects a person regardless of whether the employee speaks publicly or privately. *Connick, supra,* 103 S.Ct. at 1689. "When employee expression cannot be fairly considered as relating to any matter of political, social, or other concern to the community, government officials should enjoy wide latitude in managing their offices, without intrusive oversight by the judiciary in the name of the First Amendment." *Id.,* at 1690.

In *Connick,* the Supreme Court held "that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." *Id.,* at 1690. The record as a whole must be considered. *Id.* The government's burden in these cases may become more onerous as an employee's speech approaches issues of public concern. *Id.,* at 1692–1693. Conse-

quently, the Court has concluded that it must address the claims of these plaintiffs individually to determine whether their First Amendment rights were violated.

### 1. *Eula Bush Bundren*

The record in this case demonstrates that Mr. Peters' decision to abolish Ms. Bundren's position and to transfer her to a teaching position was made to retaliate against her for her participation as a candidate in the local election for School Superintendent. Ms. Bundren retained her position every year during Mr. Peters' first term as Superintendent until she opposed him in his race for his second term, despite a continuing concern within the school system about the size of the central office staff.

■ During the campaign, Ms. Bundren raised as an issue that Mr. Peters was receiving redundant reimbursements of expenses. This allegation was founded upon public records and borne out by a State audit of the Superintendent's accounts. Even accepting as true that Mr. Peters did not in fact receive such reimbursements, Ms. Bundren had a substantial basis in fact to make this an issue, which is obviously a matter of public concern and which could reveal "actual or potential wrong doing or breach of public trust on the part of" Mr. Peters. *Connick, supra,* at 1691. This issue was a proper subject of electioneering. Undoubtedly, Ms. Bundren's speech was "directed to matters of public concern" and, therefore, protected by the First Amendment. *Reeves v. Claiborne County Board of Education,* 828 F.2d 1096, 1099 (5th Cir.1987).

A motivating factor in Mr. Peters' decision to abolish Ms. Bundren's position was the conduct of her campaign against him and he intended to punish Ms. Bundren for what he saw as her disloyalty. Although Mr. Peters might have felt some personal animosity towards Ms. Bundren as a result of her campaign tactics, he was not justified in abusing the authority of his office to retaliate against her for exercising her rights to free speech and to seek election to a public office. The Court can conceive of few circumstances more intimately involving First Amendment values than those

presented by Ms. Bundren's election campaign. Moreover, Ms. Bundren's speech did not implicate any overriding governmental interests in the efficient operation of the school system.

■ Furthermore, the Court is convinced that Mr. Peters would not have abolished Ms. Bundren's position but-for her election campaign activities. Despite suggestions by the State as well as by several Board members to reduce the size of the central office staff, Mr. Peters made negligible efforts to accomplish this until after the 1988 election and subsequently placed or hired personnel for the central office that essentially nullified the reduction of this staff that occurred on August 22, indicating that the reasons given by Mr. Peters for certain personnel actions were pretextual and that no such action would have been undertaken regarding Ms. Bundren absent her political opposition to him. The Court finds that the personnel changes that occurred on August 22, 1988, were a smokescreen to hide retaliatory actions among otherwise constitutionally permissible administrative decisions.

The defendants failed to justify the personnel action taken in Ms. Bundren's case. No showing was made that Ms. Bundren's election campaign interfered with the efficient operation of the school system. The defendants made no showing that Ms. Bundren conducted her campaign in any manner that implicated legitimate governmental interests. The manner, time, and place of her speech were not questioned. Mr. Peters was disturbed solely by the political content of Ms. Bundren's campaign. Ms. Bundren's case does not involve an employment dispute or grievance and is confined to the context of protected political activities. As Justice Black wrote in *Mills v. Alabama,* 384 U.S. 214, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966):

"Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, struc-

tures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

*See also Garrison v. Louisiana,* 379 U.S. 64, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). Part and parcel of this fundamental right is that the government and its officials may not "impos[e] sanctions for the expression of particular views it opposes," *Smith v. Arkansas State Highway Employees, Local 1315,* 441 U.S. 463, 99 S.Ct. 1826, 1828, 60 L.Ed.2d 360 (1979). The law is now well-settled that at least some politically motivated adverse personnel actions following an election are unconstitutional. *See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Messer v. Curci,* 881 F.2d 219 (6th Cir.1989); *Columbus Education Association v. Columbus City School District,* 623 F.2d 1155 (6th Cir. 1980).

#### 2. *Betty Sue Pearman*

Ms. Pearman did not actively campaign for any candidate in the 1988 Superintendent's election but she was closely associated both professionally and socially with Ms. Bundren. Like Ms. Bundren, her job was abolished and she was transferred to a teaching position. In the Court's opinion, the evidence is insufficient to justify a finding that this plaintiff's rights to freedom of speech or association under the First Amendment were violated by Mr. Peters. The burden of proof was not met in Ms. Pearman's case on this issue. This finding is not necessarily a vindication of Mr. Peters' action regarding Ms. Pearman but merely reflects a failure of proof on Ms. Pearman's federal claim.

#### 3. *Cynthia Surber*

■ Although Ms. Surber produced some circumstantial evidence that the personnel action taken in her case may have resulted from a retaliatory motive on Mr. Peters' part, the Court has concluded that she also failed to sustain her burden of proof on her federal claim. The defendants made an adequate showing that legitimate administrative reasons existed for the personnel actions taken in some or perhaps many instances on August 22, 1988. The evidence does not demonstrate that Ms.

Surber was not among these legitimate personnel actions. She obtained tenure that evening and no loss of salary or benefits resulted from her transfer from one teaching assignment to another.

#### 4. *Elizabeth Ann Fugate*

■ Similar to Ms. Bundren's circumstances, Ms. Fugate was politically active as a member of the Claiborne County Commission, which exercised final budgetary authority over the Board of Education. Although she consistently refrained from voting on matters in which she had a conflict of interest due to her employment with the school system, her decision to abstain from voting on the July 18, 1988, resolution concerning allegations of Mr. Peters' double-dipping of expense reimbursements, which resulted from the election issue raised by Ms. Bundren, made Ms. Fugate disloyal in Mr. Peters' mind. Combined with her abstention from voting on the school budget and her past voting record in general, her vote on this resolution sealed her fate. Mr. Peters expressly commented on Ms. Fugate's Commission voting record when he explained the reasons for her transfer to her and made similar comments in the past. The Court is persuaded that Mr. Peters was improperly motivated to retaliate against Ms. Fugate for her political activities.

The Court is of the opinion that Mr. Peters' action regarding Ms. Fugate is as egregious as, perhaps more egregious than, that concerning Ms. Bundren. Ms. Fugate owed Mr. Peters and the Board of Education no duty of loyalty when sitting as a duly elected member of the County Commission. She was elected to represent the people of her district, not to represent the school system. In fact, because she had an obvious conflict of interest, she was compelled to refrain from voting on matters directly involving the Board of Education; yet she was subjected to Mr. Peters' wrath for conducting her political responsibilities in an ethical fashion. That Ms. Fugate was not even a political adversary of Mr. Peters makes his actions toward her particularly arrant.

■ Ms. Fugate was clearly exercising her rights to participate in public affairs by being a member of the County Commission. Her votes on the Commission were certainly politically protected expression and did not even vaguely implicate the school system's interest in its efficient operation. She acted as a duly elected public official and did so in a proper manner. Mr. Peters was not justified in retaliating against Ms. Fugate for her voting record as a member of the County Commission. She made no attack, political or personal, on Mr. Peters; he simply disagreed with her voting record and punished her, despite the fact that such votes were manifestly "directed to matters of public concern," *Reeves v. Claiborne County Board of Education, supra,* at 1099. No overriding governmental interest was implicated by Ms. Fugate's actions on the County Commission. As with Ms. Bundren, the Court finds that but-for Mr. Peters' retaliatory motive, this personnel action would not have been taken. Mr. Peters hid the abolition of Ms. Fugate's position and her transfer among numerous constitutionally valid personnel actions taken on August 22, 1989. The time, manner, content, context, and place of Ms. Fugate's speech were wholly appropriate and could have nothing to do with any legitimate interest of the school system.

### 5. *Wayne Parkey Fugate*

The Court finds that Mr. Fugate failed to carry his burden of proof on this issue and that the defendants adequately demonstrated that constitutionally legitimate reasons for taking the personnel action in his case existed. The evidence indicates that some Board members had expressed concern about Mr. Fugate's position for some time. Aside from being Ms. Fugate's brother, the Court cannot discern what motive Mr. Peters would have had to retaliate against Mr. Fugate. If the fact that Mr. Fugate was related to Ms. Fugate was enough to motivate retaliatory action by Mr. Peters against him, then Mr. Peters had a similar motive to take some similar action against Mrs. Ruth Fugate, a central office employee and the mother of Wayne and Elizabeth Fugate.

### B. *State Claims*

#### 1. *Open Meetings Act*

■ The plaintiffs claim that the defendants violated the Tennessee Open Meetings Act, T.C.A. §§ 8–44–101, *et seq.,* when they gathered at Mr. Peters' house before the regularly scheduled Board of Education meeting on August 22, 1988. That the Board of Education is a governing body within the meaning of T.C.A. § 8–44–102(b)(1) is undisputed. The question is whether the pre-meeting gathering of the Board constituted a meeting under T.C.A. § 8–44–102(c), which provides in relevant part that " '[m]eeting' means the convening of a governing body of a public body for which a quorum is required in order to make a decision or to deliberate toward a decision on any matter," or whether this gathering was a chance meeting under T.C.A. § 8–44–102(d), which expressly permits "chance meetings, informal assemblages, or electronic communication" as long as they are not "used to decide or deliberate public business in circumvention of the spirit or requirements of this part."

Although the kind of social gathering that occurred at Mr. Peters' home could easily be utilized to circumvent the spirit and letter of the Open Meetings Act, the evidence was clear that while Mr. Peters may have spoken with two-to-three, perhaps four, members of the seven-member Board about some public business, he did not speak individually or in a group to all members or even about the same topics. Most of the Board members and other persons present who testified could recall a generalized discussion of the school system's budget problems.

The question is a close one in this case; however, the Court has concluded that the Board did not violate the Open Meetings Act. Mr. Peters obviously manipulated the members of the Board but the Board itself made no attempt to utilize this informal setting to circumvent the requirements of the Open Meetings Act. In the Court's opinion, Mr. Peters exercised a dominating influence upon the Board, but the gathering itself constituted the kind of informal assemblage contemplated by T.C.A.

§ 8–44–102(d). In *Smith County Education Association v. Anderson,* 676 S.W.2d 328 (Tenn.1984), the Tennessee Supreme Court noted that, in recognizing a limited attorney-client privilege exception to the Act, "once any discussion, whatsoever, begins among the members of the public body regarding what action to take ... such discussion shall be open to the public and failure to do so shall constitute a clear violation of the Open Meeting Act." *Id.,* at 334. Mr. Peters manipulated the Board to the precipice of a violation but the Board did not go over the edge by deliberating or deciding any public business.

### 2. *Teachers Tenure Act*

█ All five plaintiffs challenged their transfers as violations of the Tennessee Teachers Tenure Act, T.C.A. §§ 49–5–501, *et seq.,* because these personnel actions were politically motivated, arbitrary, and not consistent with the best interests of the school system. As a matter of constitutional law, no plaintiff is entitled to a specific position within the school system, *Coe v. Bogart,* 519 F.2d 10 (6th Cir.1975); moreover, the Teachers Tenure Act itself recognizes that "[a]dministrative and supervisory personnel shall have tenure as teachers and not necessarily tenure in the specific type of position which they may be employed...." T.C.A. § 49–5–501(11)(B). Nevertheless, intra-system transfers are controlled by T.C.A. § 49–5–510, and reasonableness in transfers is required by the Tenure Act.

█ Transfers are limited "to the efficient operation of the school system" upon "the concurrent action of the Superintendent and the board." T.C.A. § 49–5–510. *See also State v. Yoakum,* 201 Tenn. 180, 297 S.W.2d 635, 642 (1956). A transfer requires no prior notice or formal hearing and " '[t]he fact that such transfer was to a lower-paying teacher position from an administrative position would only have bearing on the question of abuse of discretion.' " *McKenna v. Sumner County Board of Education,* 574 S.W.2d 527, 531 (Tenn.1978). A transfer can only be made (1) upon the concurrence of the Board, (2) in good faith, and (3) for the efficient operation of the school system. *Id.,* at 533–534.

"An employee so transferred, however, is entitled to be protected from arbitrary and capricious action, or from transfers actuated by political or other improper motives." *Id.,* at 534. Courts may review such decisions only for abuse of discretion. *Id.* The burden of proof is on the teacher to show that the transfer was arbitrary, capricious, or improperly motivated. *Id.*

█ As a part of its duties, under T.C.A. § 49–2–203(12), the Board is required to prepare or have prepared a copy of the minutes of each meeting. Corrections, changes, or modifications are permitted under this statute. The parties stipulated that the minutes of the August 22, 1988, meeting do not reflect the vote of the Board regarding Mr. Peters' personnel recommendations. The plaintiffs rely on *Randall v. Hankins,* 675 S.W.2d 712, 713 (Tenn.App.1984), to argue that because the Board can only speak through its minutes, the absence of any record of the Board's vote means that the vote cannot be binding. The members of the Board, Mr. Peters, and the five plaintiffs all agree, however, that such a vote occurred and they agree on the outcome of that vote.

The Court does not read *Randall* to hold that parol evidence cannot be taken to correct an inadvertent omission from these minutes; rather, the record in *Randall* demonstrated that an issue was whether any action in fact took place at the Board's meeting in that case, whereas in the present case no dispute exists that the vote occurred and what the outcome of that vote was. The minutes do reflect the vote on the abolition of the four administrative positions and also show that Mr. Peters made the proposed personnel recommendations. No attempt was made to impeach the minutes and thus the Court does not find *Randall* controlling in view of the language of the statute itself, the undisputed evidence in the case *sub judice,* and relevant case law permitting certain ambiguities, including some technical omissions, in official records to be explained by parol evidence. *E.g., Brumley v. Town of Greeneville,* 38 Tenn.App. 322, 274 S.W.2d 12, 14 (1954) (technical omission in minutes

of Board of Mayor and Aldermen could be explained by parol evidence).

a. *Eula Bush Bundren*

■ This Court has previously determined in this case that Mr. Peters abolished Ms. Bundren's administrative position and transferred her to a teaching position out of a purely retaliatory motive based upon her political opposition to him during the 1988 Superintendent's election. Although her transfer was made with the concurrence of the Board and arguably for the efficient operation of the school system, a politically motivated transfer is clearly not made in good faith. The Court has found that Mr. Peters used a smokescreen of legitimate and not extraordinary last minute personnel reassignments behind in which to hide improperly motivated personnel actions. Such personnel actions would obviously be arbitrary and capricious under the Teacher Tenure Act.

b. *Betty Sue Pearman*

■ Although the Court has previously concluded that this plaintiff failed to show that her constitutional rights were not violated by the defendants and thus that her transfer was politically motivated, the question remains whether her transfer was valid under the Teacher Tenure Act.

The Board concurred in Ms. Pearman's transfer and reduction of administrative overstaffing was a legitimate purpose and otherwise within the discretion of the Board and the Superintendent. Moreover, under *McKenna, supra,* a reduction in pay is permitted when it results from a legitimate transfer. Nevertheless, in *State ex rel. Pemberton v. Wilson,* 481 S.W.2d 760 (Tenn.1972), the Tennessee Supreme Court emphasized that transfers must be accomplished in a reasonable manner "either at the time of [the teacher's] selection or shortly thereafter in order that the transferee may contract or refuse to contract with the Board," and further noting that a reasonable time is "before the commencement of the next [school year]," *id.,* at 769. Furthermore, in *McKenna,* loss of salary is a relevant factor for consideration in whether the transfer was arbitrary or capricious or done in bad faith. In addition, the fact that Mr. Peters failed to maintain

the personnel reductions in the administrative staff accomplished by these transfers is a further indication of an abuse of discretion as well as evidence that Mr. Peters either exercised undue influence over the Board or that the Board too readily deferred to his recommendations without adequately considering them or their effect on the school system. Given all of these circumstances, the Court is drawn to the conclusion that this transfer was arbitrary and capricious.

c. *Cynthia Surber*

■ Ms. Surber stands on somewhat different footing than the other plaintiffs because she did not acquire tenure until August 22, 1988, at the time she was assigned to Clairfield School. No constitutional violation having been found, the Court next considers whether her transfer to Clairfield can be sustained under the Teachers Tenure Act. The Board concurred in her transfer and the proof showed that some last minute personnel reassignments of teachers occur yearly. Ms. Surber's nontenured status means that she could have been terminated without cause and that her transfer from one teaching position to another was not arbitrary or capricious. She lost no salary or benefits as a result of her transfer. Her circumstances are distinguishable from those of the other plaintiffs. No abuse of discretion appears on this record in her case. *See generally Gibson v. Butler,* 484 S.W.2d 356 (Tenn.1972).

d. *Elizabeth Ann Fugate*

As with Ms. Bundren, Ms. Fugate's treatment was politically motivated. For the same reasons stated regarding Ms. Bundren, the Court finds that this plaintiff's transfer was improperly motivated and not in good faith.

e. *Wayne Parkey Fugate*

The Court has found no violation of Mr. Fugate's constitutional rights; however, that legitimate reasons for his transfer may have existed so as to preclude recovery on his § 1983 claim does not mean that his claim under the Teachers Tenure Act may not succeed; the manner in which the

transfer was accomplished may still violate State law. For the same reasons stated in Ms. Pearman's case, the Court finds that this plaintiff's transfer was arbitrary and capricious.

### III. RELIEF

■ The Court has found that the constitutional rights of Ms. Bundren and Ms. Fugate were violated by Mr. Peters. The Court specifically holds that the members of the Board of Education did not intend to violate and did not violate the plaintiffs' constitutional rights and that the Board's actions were not impermissibly motivated; the Court has found that Mr. Peters alone, in his official and personal capacities, violated the rights of these two plaintiffs. The Board merely followed impermissibly motivated recommendations regarding these two plaintiffs. Nevertheless, on the facts of this case, given Mr. Peters' abuse of his official authority, the school system is held jointly and severally liable with Mr. Peters.

In addition, the Court has found that Ms. Bundren, Ms. Pearman, Ms. Elizabeth Fugate, and Mr. Wayne Fugate were transferred in violation of the Teachers Tenure Act. Ms. Surber recovers on no claim. The Court has found no violation of the Open Meetings Act.

Consequently, the Court ORDERS that Ms. Bundren is entitled to reinstatement as chapter II director of the Claiborne County School System and to recover all back salary accrued from August 22, 1988, including at least $6,400.59 that accrued during the 1988–1989 school year. The Court further ORDERS that Ms. Elizabeth Fugate is also to be reinstated to her former position as special education preschool coordinator and vision teacher and to recover back salary accrued from August 22, 1988, including $5,217.36 lost in the 1988–1989 school year. The Court also ORDERS that Ms. Pearman is entitled to be reinstated to her former position as chapter I reading supervisor and to recover back pay accrued from August 22, 1988, including $5,043.20 lost during the 1988–1989 school year. The Court ORDERS that Mr. Wayne Fugate is entitled to reinstatement in his former position as special education attendance supervisor and vocational assessment teacher and to recover back pay accrued since August 22, 1988, including $4,750.44 for the 1988–1989 school year. The Court does not preclude any future transfers of these four plaintiffs when made in compliance with the Teacher Tenure Act.

Finally, under 42 U.S.C. § 1988, the two plaintiffs who succeeded on their § 1983 claims are entitled to recover reasonable attorney's fees for the services rendered to them. Counsel for the plaintiffs are, therefore, DIRECTED to submit their lodestar affidavits of services rendered and expenses incurred solely on behalf of these two plaintiffs by Friday, January 5, 1990.